Charlie Mai JORDAN, and Vanessa R. Bush, Individually and on Behalf of all Other Persons Similarly Situated, Plaintiffs-Appellants,

v.

DELLWAY VILLA OF TENN., LTD., L. H. Hardaway, Jr., L. H. Hardaway, Sr., Imperial Mgt. Co., et al., Defendants-Appellees.

No. 80–5409.

United States Court of Appeals, Sixth Circuit.

Argued June 17, 1981.

Decided Oct. 19, 1981.

Robert Greene, William Henry West, Legal Services of Nashville, Nashville, Tenn., for plaintiffs-appellants.

William L. Small, Bone & Woods, Nashville, Tenn., for defendants-appellees.

Before EDWARDS, Chief Judge, and WEICK and KEITH, Circuit Judges.

KEITH, Circuit Judge.

The plaintiffs filed this class action in district court pursuant to 42 U.S.C. §§ 1981, 2000d, 3604 and 28 U.S.C. §§ 2201 et seq. They alleged that the owners and managers of the Dellway Villa Apartments in Nashville, Tennessee selected their tenants in a racially discriminatory manner. The district court found the defendants "guilty of racial discrimination" under 42 U.S.C. §§ 1982 and 3604.

The issue presented on appeal is whether the district court properly limited the size of the class entitled to recover damages. We hold, for the reasons discussed below, that the size of the plaintiffs' class was

improperly limited below and remand for further proceedings consistent with this opinion.

## I

The Dellway Villa Apartment complex is located in Nashville, Tennessee. The complex consists of 244 apartment units. Forty-eight of the units are one-bedroom apartments, 108 are two-bedroom apartments, and 88 are three-bedroom apartments. The apartment complex is a "Section 8 New Construction" project built to house families eligible for housing assistance payments under the provisions of Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f.[1] Federal mortgage insurance was provided for the complex under 12 U.S.C. § 1715.

The Dellway Villa Apartments are owned by Dellway Villa of Tennessee, Ltd. They are managed by the Imperial Management Company. Defendants L. H. Hardaway, Sr. and L. H. Hardaway, Jr. are partners of Dellway Villa of Tennessee Ltd. and the sole partners of Imperial Management.

Defendant Rodman Lilly was the General Manager of Imperial Management Company from February 1977 to April 14, 1978. As general manager, he supervised the site managers of the various apartment complexes managed by Imperial. Defendant Laura Notgrass was one of the site managers supervised by Lilly during his tenure as general manager. She managed the Dellway Villa Apartments from August 1978 to February 17, 1979. From June 1978 to August 1978, Notgrass had also been responsible for tenant applications at Dellway Villa.

On February 28, 1979, the plaintiffs filed this suit on their own behalf and on behalf of all persons allegedly denied housing at the Dellway Villa Apartments because of the defendants' racially discriminatory tenant selection practices. At the time this suit was filed, 100 of the 244 rental units at Dellway Villa were rented. The rest of the units were still under construction. Of the 100 apartments that were rented, 82 were leased to white families and 18 were leased to black families. There were 1,622 applications for apartments at Dellway Villa. Of this number, 1,195 applications were filed by black families; 427 applications were filed by whites. Thus, although 70.9% of all applicants were black, only 18% received rental units.[2]

After trial, the district court found that

[t]he site manager was not furnished any criteria for tenant selection except to select the best available from those who qualified. The site manager was less than objective. She subsequently determined who she thought would be good tenants; *i. e.*, cause little trouble, not destroy property, exhibit a stable family, *etc.* In so doing, she made no attempt to evaluate the applications in order of date

---

1. 42 U.S.C. § 1437f provides in relevant part:
    For the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing, assistance payments may be made with respect to existing, newly constructed, and substantially rehabilitated housing in accordance with the provisions of this section.

2. In concluding that there were 1,622 applications filed for housing at Dellway Villa, the district court credited the defendants' answer to plaintiffs' interrogatories. *See* Findings of Fact and Conclusions of Law Regarding Class Certification, Appendix at 64. However, official U.S. Dept. of Housing and Urban Development (HUD) reports submitted during trial showed that approximately 4,000 applications were filed for Dellway Villa housing. Appendix at 300. Moreover, HUD official Raymond

Young testified that a Dellway Villa staff member reported that 4,000 applications were on hand for apartments. Applican Fran Dennis testified that Site Manager Appleton told her that 4,000 applications had been filed for Dellway Villa. Finally, rejection letters to five black Dellway Villa applicants bear the numbers 3130–3134 in sequence, indicating their place in the total number of apartment applications received at the complex. Thus, it is not clear from the record below how many applications were filed at Dellway Villa. For the purposes of this appeal, however, it is unnecessary to determine the precise number of applicants. The district court's finding of liability against the defendants is uncontested, and the propriety of the district court's order limiting class recovery does not rest on the potential number of plaintiffs' class members.

of receipt. In effect, she had no system to prevent preference of one person over another or white over black. Although she professed no racial bias in her selections, the court finds to the contrary. Her attitude can be best illustrated by her testimony in referring to a successful applicant that 'she [the applicant] begged for it humbly.' On one application, she [Ms. Notgrass] noted: 'Black but nice: old, but nice looking, grey eyes and light skin.' She was discourteous to black applicants. She treated white applicants with respect. She planned to limit the number of black applicants in each unit. She could find available apartments for white applicants but not for blacks.

## II

In its September 10, 1979 Memorandum Opinion, the district court found that General Manager Lilly, Site Manager Notgrass and the Hardaways all violated 42 U.S.C. § 1982[3] and § 3604[4] by discriminating against black housing applicants at Dellway Villa. The court specifically found that "each of the defendants had personal knowledge of the process being used in tenant selection at Dellway Villa" and "by preferring later qualified white applicants over prior qualified black applicants, the defendants violated [the aforementioned] statutes."

After finding the defendants liable under 42 U.S.C. § 1982 and § 3604, the district court then faced the task of formulating an appropriate remedy. The court found relevant the fact that

in the past, the defendants Hardaway have had an excellent record in racial matters, that they are accepted by the black community as having contributed substantially in the training and employment field of disadvantaged blacks, and they have not been charged with racial bias in the operation of other subsidized housing. They have initiated training programs in the construction industry and have had a close working relationship with black academia.

The district court then enjoined the defendants from leasing additional units at Dellway Villa. It ordered the site manager to classify all 1,622 applications according to "bedroom requests," i. e. whether one, two or three bedrooms were desired by the applicant. Under the court order, the site manager would then compile chronological listings of the applications in each of the three groupings. Attached to each list would be a photocopy of each application and a copy of the rating sheet prepared for each applicant.

On January 3, 1980, the district court ordered the defendants to select tenants in chronological order from the lists of quali-

---

**3.** 42 U.S.C. § 1982 provides:

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold and convey real and personal property.

**4.** The Fair Housing Act of 1968, 42 U.S.C. § 3604 provides:

As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

(b) To discriminate against any person in terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith,

because of race, color, religion, sex, or national origin.

(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, or national origin, or an intention to make any such preference, limitation, or discrimination.

(d) To represent to any person because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

(e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, or national origin.

fied applicants compiled pursuant to the court's September 10, 1979 order. The court indicated that it intended to limit the number of class members that it would allow to prove and recover damages. Thus, plaintiffs filed a motion on January 29, 1980 to clarify the class members' eligibility for damages. The plaintiffs moved "that all black applicants for housing at Dellway Villa be determined to have been discriminated against and, therefore, eligible for damages because of the deliberate, systematic discrimination engaged in by the defendants." The district court responded to the motion by holding on February 22, 1980, that "[o]nly those qualified black applicants who were rejected can recover." In response to the plaintiffs' motion for reconsideration, the district court held on March 10, 1980, that "any applicant who was discriminated against by [the] defendant[s] and who was qualified at the time of discrimination but limited to the total number of apartments available may recover."

The plaintiffs filed further motions for reconsideration of the limitation on class recovery. In a September 3, 1980 Memorandum Opinion, the court reiterated its position that only the number of class members which equaled the number of apartments available at the time of the filing of this suit would be permitted to recover damages. The court stated:

> To illustrate the reasoning of the court in this case, hypothetical situations may be helpful. Congress has not created a cause of action for solely intellectual discrimination. There must be action resulting in damages. In other words, racial bias alone is not enough. Suppose we have a person who has 50 apartments for rent. He is biased against blacks and does not intend to lease to them. He receives applications numbered 1 to 100. Numbers 1 to 47 are black and 48 to 100 are white. He leases to numbers 1 to 47. He has not been guilty of discrimination in housing.

The court further stated:

> [m]any, if not most, of the applications for renting were made prior to the completion of the construction. The number of the applications far exceeded the supply. The applicants had no knowledge of any discrimination practiced by defendants ... Thus they could not have suffered any damages, emotional or otherwise, from the discriminatory acts of defendants unless they were actually deprived of housing. It thus appears logical that only those who would otherwise have received housing but for the discriminatory actions of defendants can recover damages in this case. To hold otherwise would enable all black citizens to recover damages from all individuals who harbored secret racial bias (without action thereon) against blacks. *Jordan v. Dellway Villa*, No. 79–3100 (M.D.Tenn., filed Sept. 3, 1980).

## III

Under the district court's order limiting class recovery, a substantial number of black persons who applied for housing at Dellway Villa would not be allowed to prove and recover monetary damages.[5] The appellees maintain that the district court acted properly in fashioning this order. They take this position because Fed.R. Civ.P. 23(b)(2) confers broad discretion on district courts to limit the size of classes which seek recovery of monetary damages.[6]

---

5. Even if there are only 1,622 applications in the total Dellway Villa applicant pool, a great many of the black applicants in this pool would receive no recovery under the district court's order. There are only 244 rental units at Dellway Villa. Since about 90% of the total applicants are black, most of them would not be in the "chronological position" to recover under the formula relied upon by the district court. If there are more than 1,622 applicants, which appears likely, *See* footnote 2 *supra*, then under the district court's formula, even more black applicants would be prevented from proving and recovering damages.

6. Fed.R.Civ.P. 23(b)(2) provides as follows:
   (b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied and in addition ... (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or

Upon close examination, however, we find the appellees' position on this issue without merit.

It is true that under Rule 23(b)(2) a "district court may see fit to define the class more narrowly . . . to protect the defendant in preparing his defenses against various damage claims and . . . to make disposition of the class action more manageable since the evidence as to individual claims may vary widely in scope and character." *Weathers v. Peters Realty Corp.*, 499 F.2d 1197 (6th Cir. 1974). *See also Griffin v. Harris*, 571 F.2d 767, 773 (3d Cir. 1978). However, as the appellees concede in their brief, "the district court [here] limited the size of the recovering class for *substantive* reasons" not for procedural reasons. Appellee's Brief at 5 (emphasis in original). In other words, since the district court in this case did not limit the size of the class recovery to insure sufficient manageability, *Weathers v. Peters Realty Corp., supra*, and other cases which recognize the discretion of a district court to limit class size to insure sufficient manageability, *See e. g. Fifth Avenue Peace Parade Committee v. Gray*, 480 F.2d 326, 330 n.5 (2d Cir. 1973), *cert. denied*, 415 U.S. 948, 94 S.Ct. 1469, 39 L.Ed.2d 563 (1974); *Griffin v. Harris, supra*, have no application here.

We believe that the propriety of the district court's final order limiting class recovery rests upon whether those eligible to recover damages, under the order, include all of the members of plaintiffs' class who were actually denied housing at Dellway

Villa because of their race. After an examination of the record, we must conclude that the district court's final order improperly excludes persons who may have been denied housing at Dellway Villa because of unlawful discrimination.

The appellees assert that the district court's order was proper because the excluded class members cannot prove discrimination under *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[7] This contention, however, ignores the effect of the district court's finding of a "pattern or practice" of discrimination committed by the appellees against the plaintiffs' class—a finding that is unchallenged on appeal.

In *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed. 396 (1977), the Supreme Court recognized that although a showing of class-based discrimination is sufficient to support the entry of prospective relief, a district court usually must conduct additional proceedings to determine the proper scope of individual relief. In *Teamsters*, the Supreme Court specifically rejected the company's contention that when a court fashions a retroactive remedy, the individual claimants should bear the burden of showing either (1) that job vacancies existed at the time of application or (2) that the individual claimant possessed the requisite qualifications for the job. *Id.* at 358, 97 S.Ct. at 1866. The Court held:

---

corresponding declaratory relief with respect to class as a whole. . . .

**7.** In *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court held that a plaintiff in a disparate treatment Title VII case could establish a *prima facie* case by showing that: (1) he belongs to a protected class, (2) he applied and was qualified for a job for which the employer was seeking applicants, (3) despite qualifications, he was rejected, and (4) after his rejection, the position remained open and the employer continued to seek applicants with the plaintiff's qualifications. *Id.* at 802, 93 S.Ct. at 1824. The appellees in this case draw on an analogy of the Supreme Court's holding in *McDonnell Douglas* as support for the district court's order

limiting class recovery. They assert that in order for a defendant to commit housing discrimination, "housing [must] in fact be available in cases in which there has not been a failure to accept applications or otherwise negotiate." Appellees' Brief at 11. We think that this statement of law is correct. However, the problem in this case is that there were vacancies at Dellway Villa at the time the members of plaintiff's class filed their applications. Therefore, even if the class members have the burden of making out a *McDonnell Douglas* case of discrimination, which they do not, the district court's order would still be improper because the appellees continued to seek applications for apartments after the individual claimants filed applications.

The proof of the pattern or practice [of employment discrimination] supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy. The Government need only show that an alleged individual discriminatee unsuccessfully applied for a job and therefore was a potential victim of the proved discrimination. As in *Franks [v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976)], the burden then rests on the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons. *Id.* at 362, 97 S.Ct. at 1868 (citations and footnotes omitted).

Under *Teamsters*, an individual claimant can be denied recovery only if the proven discriminator meets its burden of showing that the claimant was rejected for lawful reasons. Thus, in the remedial phase of this case, the appellees have the burden of showing that either the individual members of plaintiffs' class were not qualified for an apartment at Dellway Villa or that there were no available apartments at the time the individual claimants filed applications.

On the facts of this case, the appellees will be unable to show that there were no available apartments for the members of plaintiffs' class. It is undisputed that vacancies existed at Dellway Villa even after the last member of this class filed an application for housing.[8] Therefore, contrary to the district court's ruling, the appellees can only hope to avoid paying damages to the entire plaintiffs' class by showing that individual claimants were unqualified on the basis of preexisting racially-neutral selection policies.[9]

---

**8.** The first apartment to be rented at Dellway Villa was leased on September 15, 1978. From that date until this lawsuit was filed, 100 apartments were rented as their construction was completed. Sixty-one more apartments were rented by June 1979.

Since no applications were accepted at Dellway Villa after February 14, 1979, when this suit was filed all applications filed by the plaintiffs' class members were on hand when the 61 apartment units were rented out between the commencement and the trial of this lawsuit. In fact, the district court found that most of the applications were on hand by November 1978. Appendix at 54.

The district court found that as of September 10, 1979, "there [were] still a substantial number [of apartments] available for occupancy." Appendix at 59.

**9.** It is not entirely clear from the record whether the appellees had any racially neutral selection factors in place prior to institution of this class action. Apparently prospective tenants had to have complete applications on file in order to qualify for housing at Dellway Villa. However, the district court found that "as a calculated course of conduct, defendants began notifying certain tenants that they were not qualified because their applications were incomplete. Of course, 'only by chance,' this elementary process operated to eliminate 424 black applicants. A perusal of the applications of the successful white applicants reveals that the above action was an ill-calculated subterfuge in that their applications were in the main incomplete." Appendix at 54.

Income requirements were also apparently in effect at Dellway Villa. However, as Site Man-

ager Notgrass' testimony revealed, this policy was apparently not applied in a racially neutral manner:

Q. And so, you screened the application first? and then had interviews . . .

A. Yes.

Q. . . . how did you verify the income of the applicants?

A. Sent an employment application to their place of work.

Q. All right. Did you do this for every single application?

A. No, at first, I was . . . I didn't know that I was supposed to do that, and I just gave it to the people that came in, and asked them to take it to their employer.

Q. That was your original procedure?

A. Yes.

Q. Did you give anybody . . .

A. Then I found out later that that was not the proper procedure.

Q. All right. What was the proper procedure?

A. To mail it to the Personnel Department of the company that . . . where they were employed.

Q. All right. Now, prior to learning the correct procedure, did you give that income verification form to all applicants who came in?

A. No.

Q. How did you decide which ones to give it to?

A. Well, only the ones that I could accommodate.

Q. What do you mean by that?

A. Only the ones that I would have a building ready, and after screening them, I

The appellees maintain, and the district court concluded, that a number of the unsuccessful black applicants were not actually discriminated against and are not entitled to individual relief under *Teamsters.* In support of this conclusion, the district court reasoned that although there were vacancies at the time these class members filed their applications, no vacancies would have existed at that time if the appellees had processed in a non-discriminatory manner all the applications they received. In other words, since there are only 244 apartment units at Dellway Villa, only 244 members of plaintiffs' class can recover damages. This is because if the appellees had not discriminated against this group of 244, there would have been no vacancies for the others.

We cannot accept this analysis. We find no support in the law for the notion that a defendant can discriminate against and be required to pay damages to only the number of applicants equal to the number of openings available. In fact, in *Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978), the Supreme Court recognized that emotional suffering and other actual damages, if shown, can be recovered for a constitutional violation, even if the ultimate decision would have been the same had constitutional procedures been followed.

More significantly, however, *Carey* held that when actual damages are not present, the victims of due process violations are still entitled to nominal recovery. *See Hughes v. Rowe*, 449 U.S. 5, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980); *McKenna v. Peeskill Housing Authority*, 647 F.2d 332 (2d Cir. 1981); *Morrow v. Igleburger*, 584 F.2d 767 (6th Cir. 1978), *cert. denied*, 439 U.S. 1118, 99 S.Ct. 1027, 59 L.Ed.2d 78 (1979). Thus,

under *Carey*, the individual claimants in this case are entitled to nominal recovery even if the appellees demonstrate, during the remedial phase of this litigation, that the claimants suffered no actual damages.

In addition, the plaintiffs correctly state in their brief that "damage awards must reflect what actually occurred, they must measure the plaintiffs' [actual] losses, not what would have transpired had [all] applications been processed fairly." Plaintiffs' Brief at 36.

■ In fashioning individual recovery, the court must determine what actually occurred in an individual claimant's case. *See Carey v. Piphus, supra* 435 U.S. at 254–255, 98 S.Ct. at 1047 ("The cardinal principle of damages in Anglo-American law is that of *compensation* for the injury caused to plaintiff by defendant's breach of duty") (emphasis in original) (*quoting* 2 F. Harper & F. James, Law Of Torts § 25.1 at 1299 (1956)). *See also* D. Dobbs, Law Of Remedies § 3.1 at 135–138 (1973); W. Prosser, Law Of Torts § 2 at 7 (4th ed. 1971); C. McCormick, Law Of Damages § 1 (1935). If race played a part in the claimant's denial, then recovery of damages is mandated. *See Curtis v. Loether,* 415 U.S. 189, 197, 94 S.Ct. 1005, 1010, 39 L.Ed.2d 260 (1974); *U. S. v. Mitchell*, 580 F.2d 789, 791 (5th Cir. 1978) ("if race was a consideration and played some role in the real estate transaction," a Title VIII violation is established). *See also McDonald v. Verble*, 622 F.2d 1227 (6th Cir. 1980); *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032 (2d Cir. 1979); *Wang Lake Maxinhall Estates, Inc.*, 531 F.2d 832 (7th Cir. 1976); *United States v. Pelzer Realty Co.*, 484 F.2d 438 (5th Cir. 1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1935, 40

---

would tell them that it looked like that their application would be approved and you known, I needed to get verification of their income.

Q. I see. So, before you learned the correct pro ... did you still do that after you learned the correct procedure? Did you still wait on the mailing of the verification forms until after you'd screened the applications?

A. Yes.

Appendix at 163.

In the remedial hearings that the district court will conduct to determine the scope of each individual claimant's recovery, the appellees are nevertheless free to attempt to prove that an individual applicant would have been rejected on the basis of pre-existing racially-neutral policies. If the appellees make such a showing in any claimant's case, that claimant is not entitled to recover damages.

L.Ed.2d 286 (1974). Hypothetical factors are irrelevant to this inquiry. Accordingly, courts are not to erect hypothetical constructs of what might have happened in each individual class member's case had the defendant not discriminated against the entire class.

■ We believe that the only relevant factors in determining "what actually occurred" are (1) the pre-existing policies of the defendant, (2) the actions actually taken by the defendant pursuant to those policies, and (3) the impact of those actions on the individual claimants. If, based on these factors, a district court finds that the defendant would have treated the claimant the same way had the claimant been white, then individual recovery in that case is not warranted.

In the instant case, the district court excluded a number of plaintiffs' class members from recovery, not because white applicants would also have been rejected if they had filed applications at the same time the excluded class members applied, but because there would have been no room at Dellway Villa if the defendants had applied a racially neutral chronological selection system to the entire class.[10] As previously stated, this kind of speculative analysis is an insufficient basis for denying individual recovery. We believe the hypothesis used by the district court to limit class recovery in this case is irrelevant to determining whether race played a role in the rejection of applications filed by the individual claimants.

The critical issue in determining eligibility for recovery of damages in this case is whether an individual applicant was actually discriminated against by the defendants, not whether an individual applicant would have been able to rent an apartment at Dellway Villa if all applications had been processed fairly. Accordingly, the judgment of the district court limiting class recovery is reversed. This case is remanded for further proceedings consistent with this opinion.

WEICK, Circuit Judge, dissenting:

I respectfully dissent. Appellants have appealed to this court from an interlocutory order of the district court certifying a class entered on October 30, 1980, after a four day trial of a class action for injunctive relief and for monetary damages for racial discrimination in the rental of apartment units. The court adopted findings of fact and conclusions of law in a memorandum opinion and which certified the class and an interlocutory appeal and entered final judgment thereon from which order certifying the class the appeal was taken.

The class was certified under Rules 23(a) and 23(b)(2) as follows:

3. Because the requirements of Rule 23(a) and 23(b)(2) are met by the plaintiffs, this action shall be certified as a class action. The class consists of all

---

10. The appellees argue that "[b]y arranging the applications in chronological order and redetermining whether each applicant was indeed qualified, [the district court determined] which applicants [were] denied housing on account of illegal discrimination." Appellees Brief at 13. Thus, the district court would appear to have been properly carrying out its duty under *Teamsters* of determining if the individual claimants had in fact been treated differently and were entitled to recovery. However, this reshuffling of applications in no way revealed what actually happened in any of the claimants' individual cases. For example, the district court found that "[f]rom June 1977 until June 1978 hundreds of applications were accepted and placed in a filing cabinet. They were not separated as to size or date, nor were they alphabetized ... Beginning in August 1978, the applications which specified race were separated into three categories, according to number of bedrooms requested ... However, there was no effort to establish an order of preference based on date of application or date of receipt." Appendix at 52. Therefore, the district court's analysis based on the chronology of the Dellway Villa applications is pure hypothesis. There was no evidence that the appellees employed a chronological selection system, and the district court specifically found that they did not. Chronology simply had nothing to do with the rejection of any of plaintiffs' class members by the appellees. Accordingly, the district court's reliance on this factor in fashioning its limitation of class recovery order was improper.

black persons who have been, or will be, denied housing at the Dellway Villa Apartments, 2533 Dickerson Road, Nashville, Tennessee, because of their race.

On January 3, 1980, the court entered the following order:

It appearing to the Court as evidenced by the signatures of counsel for the parties that vacant apartments at Dellway Villa Apartments should be filled and that the tenants for existing vacancies should be chosen from the attached lists, IT IS THEREFORE ORDERED that the Defendants and their agents shall fill vacant apartments at Dellway Villa Apartments in chronological order from the names on the attached lists. Contact with applicants may be made by telephone and/or mail. When an applicant cannot be reached, counsel for Plaintiffs shall be notified and counsel for Plaintiffs will be given a reasonable amount of time not to exceed one week to make a search for the applicant.

IT IS FURTHER ORDERED that all records and files of tenants and applicants may be returned to the office of Dellway Villa Apartments.

IT IS FURTHER ORDERED that the Defendants and their agents shall not be required to take applications from prospective tenants at Dellway Villa Apartments until further Orders from this Court.

All other matters are hereby reserved.

This order was stipulated by counsel for the parties.

The complaint filed in the district court sought not only injunctive relief but also monetary damages on behalf of a class of black persons who claimed racial discrimination in the rental of the apartment units.

Only 100 of the 244 units to be constructed had been completed for occupancy at the time the complaint was filed.[1]

The district court entered an injunction against any future discrimination in the rental of the units.

The issue on appeal is whether the limitation on the class embodied in the order of the district court certifying the class should have been extended so as to include 1000 or more additional black persons who had made application to rent the apartments. They obviously could not all be accommodated because there were not enough apartments to go around. Furthermore, these additional persons were not on the list stipulated by the parties.

According to the findings of the trial judge, there were 1151 applications filed by black and 473 by white families or a total of 1624 applications for the rental of only 244 units of the apartments.[2] As of June 5, 1979, 103 of the 160 apartments rented, were rented to white tenants and 59 to black tenants.

Even if there initially had been some discrimination as found by the district court, it would have been impossible for the owners of the apartments to have accommodated all of the 1151 black applications and certainly not 4000 in 244 apartment units and there were 473 white applicants who were not without rights.

From a procedural standpoint alone, such class on its face was obviously unmanageable and the district court on that ground alone, in its discretion, had the right to limit the class. *Weathers v. Peters Realty Corp.*, 449 F.2d 1197 (6th Cir. 1974). The district court chose to limit the class on substantive grounds and it is submitted that there was no abuse of discretion on the part of the

1. Three of the units had been reserved for housing of the management. Some units had already been rented to white families before any black applications had been received.

2. There was hearsay evidence that as many as 4000 black persons were interested in renting

the apartments, but aside from the unmanageability of such a large class, it was impossible to provide for them in only 244 units of which only 100 were ready for occupancy at the time the complaint was filed.

court in so doing. The individual members of such a large class in actions for damages would no doubt be asserting a multitude of conflicting divergent claims all of which would have to be tried in separate lawsuits and by a jury.

The plaintiffs filed a motion in the district court for reconsideration of the class certification which the court denied in the following memorandum and an order entered there.

The plaintiffs' attorneys have again requested the court to reconsider its previous determination of the class. The limitation of the court was that only that number of qualified black applicants who would have received apartments but for defendants' actions can recover. Plaintiffs assert that all blacks who filed applications and were denied apartments suffered discriminatory treatment and are entitled to recover damages.

To illustrate the reasoning of the court in this case, hypothetical situations may be helpful. At the inception, Congress has not created a cause of action for solely intellectual discrimination. There must be action resulting in damages. In other words, racial bias alone is not enough. Suppose we have a person who has 50 apartments for rent. He is biased against blacks and does not intend to lease to them. He receives applicants numbered 1 to 100. Numbers 1 to 47 are black and 48 to 100 are white. He leases to numbers 1 to 47. He has not been guilty of discrimination in housing.

In the case sub judice a great many, if not most, of the applications for renting were made prior to the completion of the construction. The number of the applications far exceeded the supply. The applicants had no knowledge of any discrimination practiced by defendants. The credible proof clearly supports this finding. Except for their disappointment in failing to obtain housing in this unique experiment, they had no actual knowledge of the number, identity, race or qualification of those individuals whose applications predated their own. Thus they could not have suffered any damages, emotional or otherwise, from the discriminatory acts of defendants unless they were actually deprived of housing. It thus appears logical that only those who would otherwise have received housing but for the discriminatory actions of defendants can recover damages in this case. To hold otherwise would enable all black citizens to recover damages from all individuals who harbored secret racial bias (without action thereon) against blacks.

An appropriate order will be entered overruling plaintiff's motion.

The final judgment entered by the court adopted the previous order detailed above.

The district court did not abuse its discretion in limiting the class to manageable portions and if 4000 persons decide to file separate suits for damages triable by a jury because they were not able to rent the 244 available apartments, there is nothing to prohibit them from filing such suits. It is not believed that the apartment owners owe any duty or are under any obligation to construct additional apartment units to accommodate all of the 4000 applicants.

The findings of fact adopted by the district court were supported by substantial evidence and are not clearly erroneous. Its conclusions of law were correct.

The judgment of the district court certifying the class should be affirmed.